521 A.2d 1257

**Bryant Cheyenne WILSON**

v.

**STATE of Maryland.**

**No. 826, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

March 9, 1987.

John L. Kopolow, Asst. Public Defender, Baltimore (Alan H. Murrell, Public Defender, Baltimore, on the brief), for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., Ronald M. Levitan, Asst. Atty. Gen., Baltimore, J. Frederick Price, State's Atty. for Kent County and Susanne H. Schmoldt, Deputy State's Atty. for Kent County, on the brief, Chestertown) for appellee.

Argued before BISHOP, BELL (ROBERT M.), and POLLITT, JJ.

BISHOP, Judge.

Bryant Cheyenne Wilson appeals from the decision of the Circuit Court for Kent County to revoke both his probation and his work release program.

He raises three issues:

I. Whether the introduction of hearsay evidence during the revocation proceeding infringed on his constitutional right to confront and cross-examine witnesses?

II. Whether the evidence was sufficient to prove that appellant used marijuana while on a work release program?

III. Whether it is lawful for the trial court to revoke appellant's probation before it actually begins based on his conduct which violated his work release rules but is non-criminal in nature?

## FACTS

Appellant pled guilty to possession of marijuana and carrying a handgun. For the marijuana violation, appellant received a one-year sentence with six months suspended and a $1,000.00 fine. For the handgun violation, he received a consecutive three-year sentence with two years suspended. Upon his release, appellant was to serve concurrent, five-year periods of probation, the conditions of which included payment of the $1,000.00 fine, $75.00 in court costs, and $250.00 in public defender fees and participation in a drug program. Further, his eighteen months of incarceration, less credit for time served, were to be carried out in the Kent County Jail on a work release program, provided he worked and reimbursed the County for his living costs at the jail. He received this sentence on April 2, 1986.

Shortly thereafter, the court ordered appellant to show cause why the suspension of sentence and his probation should not be stricken. This order was based on the alleged activity of appellant on April 16.

At the show cause hearing, the State adduced evidence from appellant's probation agent, Alice Johnson. She testi-

fied that just after appellant was sentenced, she was assigned to handle the initiation of appellant's work release and future probation. The next day appellant secured a position at a car dealership. The cynosure of appellant's hearing, the day of April 16, began with appellant leaving the jail at 7:20 a.m. and reporting to work. Later that morning he went to Kent and Queen Anne's Hospital emergency room where he waited for two hours and then was told to call Dr. Arrabel and schedule an appointment for that day. Appellant was driven to the doctor's office by a Ms. Joan Garner. The doctor diagnosed a strep infection of the throat. Finished with the doctor shortly after noon, appellant hitchhiked back to Chestertown, arriving at 2:30 p.m. He then bought medication and went to a residence to check on his car. He returned to the jail at 4:15 p.m.

Agent Johnson testified that, as part of the normal procedure accorded those granted work release, appellant was informed on April 3 of the standard work release guidelines. The agent explained each of the nine written rules to appellant. At that time, appellant indicated he understood the rules and he signed the copy containing the rules. One of the rules implicated by appellant's conduct on the 16th of April was Rule 6 which stated "You are authorized to take meals at public restaurants or your place of employment. Other than eating your meals out, you may go nowhere else but your place of employment. You cannot return home, go to a motel, or any other place."

Agent Johnson testified that appellant told her that he visited a residence in Chestertown to check on his car. When appellant told her about his trip to check on his car, her suspicion was aroused as to how he spent the rest of the day. Ms. Johnson stated, "I wanted some indication that he had not been using any illicit drugs, considering that he had been absent or at a place other than his employment."

On April 17, the day after his unauthorized visit, she asked appellant for a urine sample, but he was unable to

"void". She left urine testing supplies for him to fill over the weekend, but appellant did not use them. On April 21, Major Lamont Cooke, the jail administrator, supervised and obtained a urine sample from appellant which tested positive. This violated work release Rule 2 which states: "The consumption of alcohol and non-prescribed drugs, both in jail and while going to and from work and while at work is strictly prohibited.... The use of either alcohol or drugs will result in the loss of work release privileges."

Based on the two alleged violations, the State instituted work release and probation revocation proceedings. At the hearing's conclusion, the trial judge ruled that appellant violated both rules and revoked his work release and probation.

## I. & II.

### *The Urine Test, Due Process And Sufficiency*

Appellant contends that, as a probationer, his due process right of cross-examination was violated at his revocation hearing. Before we address his argument, we first explain the factual practice for this contention. On April 21, at the request of Probation Agent Johnson, Major Cooke, the Kent County Jail Administrator, obtained a urine sample from appellant. He gave it to Ms. Johnson who mailed it to National Health Laboratories (NHL), a company located in Vienna, Virginia which contracted with the Maryland State Division of Parole and Probation to test for drugs in urine. On April 25, the report received by her indicated a numerical value of 95 for marijuana.

Over objection, the State introduced the report into evidence at the revocation proceeding. Agent Johnson opined that a value of 95 revealed the presence of marijuana in appellant's urine and its recent use by him. She was told by NHL that the test used may detect marijuana ingested up to 25 to 30 days prior to urination.

Arthur Ford, a field supervisor for the Kent County Parole and Probation office, testified that NHL has had the

Parole and Probation Division contract for drug screening tests since August, 1983. In July, 1983, he attended a half-day training session which consisted of discussions of the various testing procedures and the interpretation of test results. He explained the numerical analysis assigned to the urine test by NHL and that a value from 0 to 22 is not considered a positive reading. Any value over 22, however, is considered positive and the higher the value the more recent the use. The highest positive value he had seen was 105. Over objection he stated his opinion that the 95 reading assigned to appellant indicated he had recently used marijuana.

Appellant argues that he was deprived of his due process right in these proceedings because he did not have the opportunity to confront and cross-examine adverse witnesses. He objects to the report as hearsay. He also asserts that because an expert from NHL was not required to testify to support the content of the report, he was deprived of his right to cross-examine witnesses. He further argues that because NHL personnel did not testify and no witness for the State knew what scientific procedure was used or the test's degree of accuracy, reliability was presumed, not proven.

A probationer has a limited liberty interest; nevertheless, that person is entitled to minimal due process rights. *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). In *Morrissey* and *Gagnon,* the Supreme Court outlined the minimum due process requirements as applied to parole and probation hearings. Of the six requirements, the only one implicated in this case is the right to confront and cross-examine adverse witnesses.

The *Morrissey* Court held that parolees have "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation.)" 408 U.S. at 489, 92 S.Ct. at 2604. The

Court emphasized, however, that the process must be flexible to the extent that a court could consider documentary evidence which may not meet evidentiary requirements applicable to criminal trials. *Id.*

The Court in *Gagnon* held that probationers enjoy the same procedural rights accorded parolees in *Morrissey.* 411 U.S. at 782, 93 S.Ct. at 1759. With respect to cross-examination, *Gagnon* struck a cautionary note:

> An additional comment is warranted with respect to the rights to present witnesses and to confront and cross-examine adverse witnesses. Petitioner's greatest concern is with the difficulty and expense of procuring witnesses from perhaps thousands of miles away. While in some cases there is simply no adequate alternative to live testimony, we emphasize that we did not in *Morrissey* intend to prohibit use where appropriate of the conventional substitutes for live testimony, including affidavits, depositions, and documentary evidence.

411 U.S. at 783 n. 5, 93 S.Ct. at 1760 n. 5.

This Court recently applied those same requirements to a probation revocation hearing in *Fuller v. State,* 64 Md.App. 339, 495 A.2d 366 (1985).

 In deciding whether appellant was denied due process, we reiterate that he is entitled to cross-examine witnesses against him, unless a specific finding of good cause to deny the right is made by the trial judge. *Morrissey,* 408 at 471, 92 S.Ct. at 2593; *Fuller,* 64 Md.App. at 350, 495 A.2d 366. The trial judge here made a specific finding that it would be cost prohibitive to call a representative of NHL from Virginia to testify. Under the circumstances in this case we hold that finding to be good cause.

 Hearsay evidence is admissible, and a probationer is therefore deprived of cross-examination, only if the hearsay evidence is reliable. *Fuller,* 64 Md.App. at 351, 495 A.2d 366 (citations omitted). The remaining question is whether the hearsay was so unreliable that its introduction would violate appellant's due process if the trial court used it as a basis for revoking appellant's probation.

■ Appellant argues that there are four different methods for determining the presence of marijuana in urine. One urine analysis test, called the enzyme multiple immunoassay technique (EMIT), has been deemed unreliable when used by itself. *Higgs v. Wilson,* 616 F.Supp. 226 (D.C.Ky.1985); *Wykoff v. Resig,* 613 F.Supp. 1504 (D.C.Ind. 1985). EMIT's advantages are threefold: it is quick, inexpensive and operable by nonscientific experts. *Higgs,* 616 F.Supp. at 229. However, these courts required backup tests to be performed because the test does not measure the drug but measures the reaction of an enzyme to the drug. *Higgs,* 616 F.Supp. at 228. According to these courts, a positive confirmation by the second test bears sufficient indicia of reliability.

In the case *sub judice,* neither Agent Johnson nor Arthur Ford testified as to what type of test was admissible, just that the specimen was assigned a numerical value of 95. No test-taking procedure was ever offered by the State. We have no way of determining whether EMIT test was used or not. We are not prepared to say that the EMIT test is *per se* unreliable. In fact, other courts have found EMIT to be reliable. *Peranzo v. Coughlin,* 608 F.Supp. 1504 (S.D.N.Y. (1985)); *Vasquez v. Coughlin,* 118 A.D.2d 897, 499 N.Y.S.2d 461 (1986). The facts in this case, however, require us to remand for further proceedings in order to ascertain what test was used and its reliability. We do not interpret *Morrissey, Gagnon* or *Fuller, supra,* to mean that the State is entitled to revoke probation based on an unidentified lab test admitted into evidence without proof of its reliability.

Appellant is an extreme diabetic. Ms. Johnson admitted she had no idea what affect appellant's twice-a-day insulin shots would have on the test results. Mr. Ford stated that he questioned a Mr. Krump of NHL about the insulin. Krump told Ford that it would not affect a positive reading, but the marijuana remains in the system longer. With insulin the positive reading is stretched from the usual four weeks to up to six weeks. This fact becomes significant

when we consider that appellant was sentenced on April 2 and tested on April 21. It is possible that the marijuana was in appellant's system before he was sentenced and put on work release. Faced with this dilemma on cross-examination, Ms. Johnson stated "... [B]ut Mr. Wilson had been incarcerated since February 21st." While this may be true, nothing in the record indicates appellant was apprised before April 2 of the fact that he would lose his probation and work release status on account of drug use.

The State would have us uphold the admissibility of the laboratory report based on *United States v. Penn*, 721 F.2d 762 (11th Cir.1983). The court in *Penn* accepted an unsupported laboratory urinalysis report on the basis of an unsworn letter that various people worked on each laboratory test. The court found these exhibits were reliable, stating:

> The court's finding was a reasonable one, since laboratory reports such as those at issue here are the regular reports of a company whose business it is to conduct such tests. The laboratory expects its clients to act on the basis of its reports, and doctors and hospitals do so act. Although Penn objects to Busby's testimony summarizing the results of those urine tests, this testimony was in the nature of an outline of what the exhibits themselves actually showed, restating what was contained in the exhibits.

*Id.* at 766.

In addition to the supportive evidence contained in the exhibits themselves, the *Penn* court based the probation revocation on the testimony of Penn's probation officer that Penn used drugs. This corroborated the laboratory report. Further, Penn never denied taking drugs, but merely asserted his right to cross-examine those who performed his laboratory test. Contrary to *Penn*, in the case *sub judice* appellant denies taking drugs and there is no corroboration of appellant's drug use.

The State also relies on *United States v. Bell*, 785 F.2d 640 (8th Cir.1986). The *Bell* court affirmed the district court's admission of a positive urinalysis laboratory report.

The court ruled that the report contained "substantial indicia of reliability," citing *Penn.* *Id.* at 643. Further, the court noted "that no evidence was presented to contradict Bell's drug usage...." *Id.* Moreover, the court buttressed the laboratory report's reliability with police reports filed at the time of Bell's arrest which indicated drug use by Bell. Again, the case *sub judice* is factually different.

Finally, the State relies on *Jefferson v. Pennsylvania Board of Probation and Parole,* —— Pa. Commonwealth Ct. ——, 506 A.2d 495 (1986) where the court held the probationer violated his probation based on a laboratory report introduced into evidence without supporting expert testimony. The *Jefferson* court relied on a Pennsylvania statutory provision aimed at broadening admissibility of evidence in parole revocation proceedings. *Id.* 506 A.2d at 498. A subsequent Pennsylvania court, however, quickly distinguished the *Jefferson* case in *Powell v. Pennsylvania Board of Probation and Parole,* —— Pa. Commonwealth Ct. ——, 513 A.2d 1139 (1986). In *Powell,* the court held that a laboratory report used to establish drug abuse by a parolee was inadmissible hearsay. The court reasoned that the laboratory report, if presented into evidence without testimony from expert personnel, "should contain indicia of regularity and reliability greater than that to be seen on the report appended to this opinion, which on its face, could be merely the product of some home computer printer." *Id.* 513 A.2d at 1144.

In short, we are unpersuaded by the cases cited by the State. We hold that the laboratory report at issue in the case *sub judice* is not sufficiently reliable to justify appellant's probation revocation. We remand to the trial court for further proceedings.

### III.

#### *Authority to Revoke Probation*

■ Although our holding under issues I and II are dispositive of this case, we will address issue III for the purpose of further clarification.

Appellant argues that the trial court lacked authority to revoke his probation before it began. Recently, in *Matthews v. State*, 304 Md. 281, 498 A.2d 655 (1985), the Court of Appeals addressed, for the first time, whether a court could revoke a defendant's probationary status before it began. The appellant in *Matthews* was placed on work release and during this status he was convicted of violating some of this State's controlled dangerous substance laws. Subsequently, the trial court revoked this probation based on these convictions even though the appellant had yet to be placed on probation. Matthews argued that the trial court lacked authority to take such action. The Court rejected the argument, holding:

> We are persuaded that a trial court has authority to revoke probation for criminal acts committed after the imposition of sentence but before service of probation based on a condition implicit in the grant of probation that the defendant obey all laws.

*Id.* at 292, 498 A.2d 655.

*Matthews* decided that probation can be revoked before it begins for *criminal acts* committed during a preprobation period. In the case *sub judice*, the trial court based appellant's revocation on two grounds: the use of marijuana as evidenced by the drug test and the unauthorized trip to check on his car.

Use of marijuana falls within the ruling in *Matthews*. If on remand the trial court is "reasonably certain" that appellant voluntarily ingested marijuana, then MD.ANN. CODE art. 27, § 287 is implicated and this may be a proper basis for revocation.

JUDGMENT REVERSED;

CASE REMANDED FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY KENT COUNTY.