**McKinney v. State, Nos. 130/359 of the 2017 Term, Opinion by Moylan J.**

A REVOCATION OF PROBATION – A PATTERN OF RECURRING DOMESTIC VIOLENCE – PETITION FOR THE REVOCATION OF PROBATION – THE CONTENTIONS – PROBATION MAY BE REVOKED AT ANY TIME – MATTHEWS V. STATE IS ALIVE AND WELL – "WHAT'S IN A NAME? THAT WHICH WE CALL A ROSE BY ANY OTHER NAME WOULD SMELL AS SWEET" – AN ALTERNATIVE CONCEPTUALIZATION – NOTICE OF FEBRUARY 21, 2017, HEARING – THE LEGALITY OF THE SENTENCE – A. DID THE SENTENCE HONOR THE PLEA AGREEMENT? – B. BACK TO THE FUTURE – C. PROBATION IMPLIES THE POSSIBILITY OF ITS REVOCATION

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

Nos. 130/359

September Term, 2017

_____

DEREK MCKINNEY

v.

STATE OF MARYLAND

_____

Woodward, C.J.,
Wright,
Moylan, Charles E., Jr.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed: November 8, 2018

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document " authentic.



Suzanne C. Johnson, Acting Clerk

A revocation of probation can be ordered because of triggering misbehavior that occurs not only during a period of active probation (the far more common case) but also because of misbehavior occurring before the active probationary period has even begun (the rarer case). Because the overwhelming majority of revocation cases, however, are based on violations occurring while on active probation, there has resulted the inevitable linguistic slippage of the name for that most common instance of the phenomenon being casually misused to denote the larger phenomenon itself, of which it is but a part. "Violation of probation" is thus being used as casual shorthand for "revocation of probation." The specific usurps the generic. It is an easy overgeneralization to lapse into, akin to referring to all refrigerators as Frigidaires, to all tissue as Kleenex, or to all soda pop as Coke. Such slack usage, fortunately, is aggravating but seldom fatal.

In this case, we are dealing with a revocation of probation that was not based on a violation of active probation. Because "violation of probation" is a more chronologically restrictive term than "revocation of probation," we must steel ourselves against using so potentially confusing and anachronistic a term. Revocation is our subject and our only subject. The behavior that triggers revocation, as happened here, may occur in jail as well as on the street.

## A Pattern Of Recurring Domestic Violence

On November 18, 2011, the appellant, Derek McKinney, entered guilty pleas to one count of first-degree assault and one count of using a handgun in the commission of a crime of violence before Judge Robert A. Greenberg in the Circuit Court for Montgomery County. Pursuant to a plea agreement, Judge Greenberg sentenced the appellant to a term

of 25 years' imprisonment on the assault conviction with all but 10 years suspended, to be followed by a period of probation for three years. For the handgun conviction, the sentence was a concurrent one of 20 years, five years without the possibility of parole, and with all but 10 years suspended. From the initial statement of facts offered in support of the guilty plea and from the subsequent sentencing procedure, it was evident that a heavy concern of both Judge Greenberg and the State was the future safety of the assault victim, Lily Mona Hakemian.

Ms. Hakemian's vehicle had been stopped in rural Montgomery County at 1:30 on the morning of May 17, 2011, for a minor traffic infraction. The appellant was the front-seat passenger and Ms. Hakemian was driving. When asked for identification, the appellant had none and gave his name as Steve Johnson. A computer check informed the stopping officer that Ms. Hakemian had an outstanding protective order against the appellant. Ms. Hakemian, moreover, appeared to be upset and to have been crying. The appellant was arrested for having violated the protective order. He had a strong odor of alcohol on his person and had watery bloodshot eyes. From the passenger floorboard where the appellant had been sitting, the police recovered a loaded .357 Magnum Taurus revolver. The revolver was registered to Ms. Hakemian. Ms. Hakemian informed the court that she had purchased the gun for the appellant at his request because he was prohibited from doing so.

The police learned from Ms. Hakemian that she had earlier gone to the appellant's residence in Bethesda that evening. The statement in support of the guilty plea recounted:

> They went into the home. They went into his bedroom. <u>The defendant had possession of the 357 Magnum. He told her to lie face down on the bed, placed the gun to her head and pulled the trigger, cycling the cylinder in the</u>

revolver. <u>He</u> then ordered her to do his laundry, and in the laundry room, pointed the gun at her and <u>instructed her to place the barrel of the gun in her mouth.</u> The State would have presented in evidence that she believes she observed several live rounds of ammunition in the cylinder.

A short time later, he and she both left the Southport Drive residence together and went to the (unintelligible) Shed Ale House (phonetic sp.) where they consumed alcohol and had some food, and to Quincy's (phonetic sp.) where the defendant consumed additional alcohol.

<u>They</u> then left the, left Quincy's and <u>went to the McDonald's restaurant in Gaithersburg</u> at Montgomery County. When they pulled into the parking lot, to the rear of McDonald's, in the Vicinity of the Sport Authority, <u>he told her to get out of the vehicle. She did, and he fired a round from the revolver into the air.</u> They got back in the car, went through the drive-through, and while in the drive-through, <u>while ordering food, he pointed the gun at her and again directed her to place the barrel of the gun in her open mouth.</u>

(Emphasis supplied).

When Judge Greenberg asked if Ms. Hakemian did so, the prosecutor responded:

[THE PROSECUTOR]: Yes, sir. The weapon was placed in her mouth on both occasions, making contact with her person.

The State would have — and from the McDonald's restaurant, then, the vehicle went on to Route 355 north, where it was, Sergeant Lubson observed it at that intersection, Your Honor.

Judge Greenberg then accepted the guilty plea. As the court then turned to the actual sentencing, Judge Greenberg set out in meticulous detail every aspect of the sentence in all regards. His final words to the appellant were unequivocally clear:

**"You are to have no contact with Lily Hakemian."**

Even before that pronouncement, Ms. Hakemian had informed the court that she had visited the appellant while the charges were pending on a weekly basis and had spoken to him by telephone on numerous occasions. It was precisely to curtail such contacts that

3

the prosecutor had requested of the jail authorities that the appellant be placed on administrative segregation for a period of 60 days. There was, moreover, a significant exchange between Judge Greenberg and Ms. Hakemian as to whether she wished to be permitted to have contact with the appellant while he was in jail. It was clear that pre-probationary contact between the appellant and Ms. Hakemian was a subject of serious consideration. Indeed, even before announcing an absolute prohibition on any contact with Ms. Hakemian, Judge Greenberg had engaged in a lengthy dialogue with the appellant about that very subject.

> THE COURT: Let me first say that these cases pose particular difficulties to the Court because we have two people who obviously had some degree of affection for one another, and it sounds like still do. But I've come to learn, both from hearing these cases and from some training judges get about this problem that we call domestic abuse, and this is the kind of case, frankly, that bears all the earmarks of an extremely volatile situation. When you love someone, you don't ask them to put a loaded handgun in their mouth, nor do you put one in your own mouth in their presence.
>
> So, I'm, with all respect to Ms. Hakemian, I'm not really so concerned with whether she wants to see you or talk to you or not, because I wasn't born yesterday, you know, I didn't just fall off the turnip truck, as they say; I'll be very surprised if Ms. Hakemian doesn't make some effort to contact you, but it isn't going to happen on my watch, if you know what I mean. You two have a relationship that is going to result in severe injury or death of one or both of you.
>
> I can't tell Ms. Hakemian what she should do with her life. Those are choices that she needs to make, and to some extent, they're choices that you're going to need to make; but to suggest that it would be appropriate for me to pass a probationary order here that allows her to contact you, and more significantly, allows you to contact her, is something I'm just not going to do.
>
> THE DEFENDANT: Yes, sir.

THE COURT: I think Mr. Helfand does have a good point with regard to the probation and the condition and the terms of it, and we'll get to that in a second.

But this is a very frightening case from a number of standpoints. And as I said, if Ms. Hakemian decides that she wants to contact you in prohibition of this Court's order, that's something that I would encourage her not to do, but she's not the subject of the probation order; you are. So, I just want to tell you that I'm going to prohibit her, prohibit you from having contact with her. But understand that even in spite of her misguided intentions, if she calls you, even though she's the one that did it, like she's the one that wrote the letters, and I have no doubt she did, she is the one that comes to see you, I have no doubt she did, she's getting you in trouble.

THE DEFENDANT: Uh-huh.

THE COURT: So, if someone finds out about it, frankly, I'm not going to really care too much whether she called you or not. If she tries to get hold of you or whatever, you need to tell her, "No." I'm sorry to break up the relationship you have, but that happened back in May of 2011.

(Emphasis supplied).

## Petition For The Revocation Of Probation

The appellant failed, however, to heed Judge Greenberg's order and to discontinue any contact with Ms. Hakemian. It was four years later, on September 20, 2015, that the State filed its Motion to Prevent Intimidation of Victim/Witness Pursuant to Section 9–304 of the Criminal Law Article. A hearing date on the motion was set for November 4, 2015. On that date, the appellant appeared without counsel. Judge Greenberg postponed the case so that the appellant could obtain the services of the Office of the Public Defender. On February 3, 2016, the State filed, pursuant to Maryland Rule 4–347, a Petition for Revocation of Probation. A joint motion by the State and the appellant requested that both

motions be considered at the same hearing. There were then numerous postponements of the hearing date on what became entitled as the State's Motion for Appropriate Relief.

On May 27, 2016, the appellant's Consent Motion to Continue represented that he needed time to listen to all of the telephone recordings that the State had provided him in discovery. The recordings were of threatening phone calls the appellant had made to Ms. Hakemian from jail. By letter on December 29, 2016, Judge Greenberg requested updated information on the possible parole/early release date of the appellant. The judge rescheduled the postponed hearing for February 21, 2017, and expressed his concern "for the victim's safety at the present time should [the appellant] be released before the February hearing." From Judge Greenberg's expression of concern for Ms. Hakemian's safety, it was clear that he did not want the appellant's probation even to begin. He was obviously looking for a way to secure Ms. Hakemian's safety against any risk posed by the appellant's even being on the street. It was clear that probation had not yet even begun.

For the appellant now to claim, therefore, that he had no idea that Judge Greenberg's final order at the sentencing hearing that he was to have "no contact with Lily Hakemian" had any applicability at any time before his probation actually began is disingenuous. At the aborted hearing on November 4, 2015, when the appellant showed up without counsel, the State explained to the appellant that it had filed its motion to prevent him from intimidating Ms. Hakemian. It also explained that the appellant could be subject to the revocation of his probation if it were found that he had committed a criminal offense even before his probation began. Judge Greenberg, moreover, stressed the importance for the appellant to retain counsel and he cautioned the appellant not to say anything at that time.

6

He further warned the appellant that he would be at risk if he had contact with Ms. Hakemian. This was pre-probationary behavior that was being discussed.

The ultimate hearing on the State's motion to revoke probation took place on February 21, 2017. The State produced evidence of five collect phone calls that the appellant had made from jail to Ms. Hakemian. In the course of those calls, the appellant blamed Ms. Hakemian for ruining his life by "snitching" to the police about his putting the gun in her mouth. The appellant blamed her for his incarceration. He threatened, "If you want me to kill [you], keep running your mouth." The appellant characterized himself as "a sociopath" and threatened to make her "pay for the 10 years [she] put him in jail." He cautioned her to enjoy the next couple of years because they were going to be her last. He threatened to "murder" her, to "burn [her] ass up until [her] fucking heart stops," and to dump her body "in the river." The appellant ordered Ms. Hakemian to answer his phone calls and he told her, "I'm going to wind up beating your fucking brains in, when I get home I will take care of your ass. I'm not only abusive, I'm going to murder you."

Judge Greenberg found that the calls placed by the appellant were not simply threatening in nature to the assault victim with whom the appellant had been cautioned and admonished by the court to discontinue contact, but were also literal violations of two criminal statutes. One was Section 32–19 of the Montgomery County Code of Ordinances, dealing with "Obscene, indecent or threatening language over telephone." That ordinance provides in pertinent part:

> If any person shall use obscene or indecent language or shall threaten any person with physical harm or shall make indecent proposals to any person by

7

means of the telephone he shall be subject to punishment for a class A violation as set forth in section 1–19 of chapter 1 of the County Code.

(Emphasis supplied).

The other violation was of a Maryland statute, Criminal Law Article, Sect. 3–804, which provides in pertinent part:

> (a) A person may not use telephone facilities or equipment to make:
>
> . . .
>
>> (2) repeated calls with the intent to annoy, abuse, torment, harass, or embarrass another[.]

The appellant was, moreover, in violation of two earlier protective orders. Judge Greenberg then reimposed the original sentences of November 18, 2011, with no portion of the sentences being suspended and with no probationary period to follow.

### The Contentions

Having been granted leave to appeal the revocation of probation on January 10, 2018,[1] the appellant now contends:

> I. THE LOWER COURT LACKED THE AUTHORITY TO FIND THAT MR. MCKINNEY VIOLATED PROBATION BEFORE IT COMMENCED.
>
> II. HOLDING A VIOLATION OF PROBATION HEARING UNDER THE CIRCUMSTANCES OF THIS CASE VIOLATED MR. MCKINNEY'S RIGHT TO DUE PROCESS.
>
> III. THE LOWER COURT IMPOSED AN ILLEGAL SENTENCE.

---

[1] On March 16, 2017, the appellant had filed a Motion to Correct an Illegal Sentence, which was denied by Judge Greenberg without a hearing on March 29, 2017. On April 18, 2017, the appellant appealed from that denial. That appeal has now been consolidated with his appeal from the revocation of his probation. They are both now before us.

## Probation May Be Revoked At Any Time

The appellant's key contention is simplistic. He asserts that no one, certainly not he himself, can be guilty of "violat[ing] probation before it commenced." If he means, as he clearly seems to say, that one cannot commit an act (the act that is the violation) at a time that has not yet come to pass, he is simply stating a truism. A tautology! Such a statement is self-evidently true. We cannot defy Newtonian physics. We cannot defy Aristotelian logic. We may not move at will in and out of a time warp. We may not manipulate the fourth dimension. That would, indeed, be jumping the gun.

Fortunately, no such anachronism occurred in this case. Ordinarily, a violation of probation is something that takes place outside the prison gates after a term of active probation has begun and the probationer is on the street. Not only did no such thing happen in this case, but no one remotely suggested that any such thing happened. The critical event, the timing of which must be closely examined, was not a violation of active street probation but the antecedent revocation of an award of probation that had not yet begun.

The indisputably controlling law is the opinion of Judge McAuliffe for the Court of Appeals in Matthews v. State, 304 Md. 281, 498 A.2d 655 (1985). In Matthews the new criminal offense, violation of the controlled dangerous substance laws, that triggered the revocation of probation occurred, as here, before the period of active probation had actually begun and while Matthews was still serving his prison sentence (albeit on work release). At the very outset of the opinion, Matthews announced what would be its ultimate holding:

> We here decide that . . . Appellant's probation was properly revoked upon proof of criminal activity occurring between the grant of probation and its formal commencement.

304 Md. at 283 (emphasis supplied).

Matthews's new criminal offense had occurred at a time before his probation had actually begun but that did not in any way inhibit the authority of the court to revoke that probation before it had begun.

> Having determined that Appellant's probation could not lawfully begin until his actual release from imprisonment, we turn to <u>the question of whether his right to probation may be revoked for criminal acts committed after sentencing but before commencement of probation</u>.

> Article 27, § 641A(b) provides that "[t]he court may revoke or modify any condition of probation or may reduce the period of probation." <u>This broad grant of authority</u> to revoke probation <u>does not contain any limitation as to when the power may be exercised</u>, and <u>we therefore find no statutory bar to the revocation of probation before it has begun.</u>

304 Md. at 288–89 (emphasis supplied).

Judge McAuliffe's opinion quoted with approval, at 304 Md. 290, from <u>Martin v. State</u>, 243 So.2d 189, 190–91 (Fla. App. 1971), as it, and numerous other state cases, stood for the proposition that an implied condition of every suspended sentence or grant of probation is that the defendant shall obey all laws.

> The question here is whether a defendant probationer can, with impunity, engage in a criminal course of conduct (or for that matter any course of conduct which is essentially contrary to good behavior) <u>during the interval between the date of an order of probation and some subsequent date when the probationary term is to commence. We think not</u>.

(Emphasis supplied).

<u>Matthews</u>, 304 Md. at 290, also quoted with approval <u>Wilcox v. State</u>, 395 So.2d 1054, 1056–57 (Ala. 1981), for the principle that "a condition implicit in every . . . probationary sentence [is] that Defendant . . . will not commit another criminal offense."

10

[W]here . . . Defendant commits a felony while under a probationary sentence, although prior to the effective date of the probationary portion of the sentence, and its terms and conditions are not yet expressly prescribed, the sentencing court is nevertheless authorized to revoke Defendant's probation for violation of a condition implicit in every suspended or probationary sentence: that Defendant, while under such sentence, will not commit another criminal offense.

(Emphasis supplied).

Matthews wrapped up its survey of the national caselaw by quoting with approval,

304 Md. at 291, from Commonwealth. v. Dickens, 327 Pa. Super. 147, 475 A.2d 141, 144

(1984):

If, at any time before the defendant has completed the maximum period of probation, or before he has begun service of his probation, he should commit offenses of such nature as to demonstrate to the court that he is unworthy of probation and that the granting of the same would not be in subservience to the ends of justice and the best interest of the public, or the defendant, the court could revoke or change the order of probation.

. . . .

The commission of a new crime violates an implied condition of the order imposing probation.

(Emphasis in original).

Judge McAuliffe's conclusion then nailed its landing.

We are persuaded that a trial court has the authority to revoke probation for criminal acts committed after the imposition of sentence but before service of probation based on a condition implicit in the grant of probation that the defendant obey all laws. Our statutory scheme does not preclude the revocation of probation before it commences and the purposes for granting probation would be effectuated by recognizing this authority.

304 Md. at 292 (emphasis supplied; footnote omitted). See also Wilson v. State, 70 Md.

App. 527, 537, 521 A.2d 1257 (1987) ("Use of marijuana falls within the ruling

11

in <u>Matthews</u>. If on remand the trial court is 'reasonably certain' that appellant voluntarily ingested marijuana, then MD. ANN. CODE art. 27, § 287 is implicated and this may be a proper basis for revocation.").

## <u>Matthews v. State</u> Is Alive And Well

The appellant's response to the clear command of <u>Matthews v. State</u> is to assert that <u>Matthews</u> has been modified or refined or somehow compromised by subsequent authority. In arguing for the overruling of <u>Matthews</u>, the appellant tries to pin the abrogating rap on <u>Donaldson v. State</u>, 305 Md. 522, 505 A.2d 527 (1986), but produces neither facts nor legal argument to sustain such a charge. The appellant asserts that "<u>Donaldson</u> . . . made clear that the authority granted by Sect. 641A(b) to 'revoke or modify any condition of probation' <u>only</u> applies when the probationer has <u>not</u> violated his probation." (Emphasis in appellant's brief). We confess that we are completely unable to follow appellant's argument.

Our short answer to this questioning of <u>Matthews</u>'s continuing authority is to note that <u>Donaldson</u> never so much as mentioned <u>Matthews v. State</u>, either by name or implicitly. The <u>Donaldson</u> opinion, moreover, does not remotely deal with the <u>Matthews</u> principle now under discussion—the authority of the trial court to revoke probation before the period of active probation has actually begun. We find nothing remotely to suggest that the holding of <u>Matthews</u> before us in this case has been eclipsed or otherwise diminished in any regard by judicial opinion or rule of court or statute. It controls this case. <u>Matthews</u> is alive and well.

12

**"What's In A Name?**
**That Which We Call A Rose**
**By Any Other Name Would Smell As Sweet"[2]**

In this case, to be sure, all parties consistently referred to a "violation of probation" rather than to a "revocation of probation." All parties, however, were reading off the same page and no one was for a moment confused. The revocation hearing took place on February 21, 2017, well before the period of actual on-the-street probation was to begin. No word of protest or objection was uttered by the appellant about an ostensibly surrealistic chronology. Appellant, appellant's attorney, prosecuting attorney, and trial judge all knew precisely what the issue was before the court.

The violations in question, the collective basis for the revocation, were five specific telephone calls made on May 2, 2014; on May 5, 2014 (two calls); on October 4, 2014; and on March 7, 2015, from the appellant to Ms. Hakemian. All of those calls were made from the jail and were recorded by the jail authorities. They were all made before any period of active probation had begun. The substance of those calls was heard in full by Judge Greenberg and was the basis for his decision to revoke probation.

It was not the labeling of the procedure but the undergirding significance of the appellant's conduct that dictated the result and that confirms the correctness of the result. That undergirding reality inheres in the fundamental purpose of the phenomenon called probation. When a sentencing judge awards a present or future grant of probation in place of some or all of a prison sentence, the judge's discretionary decision in that regard is based

---

[2] <u>Romeo and Juliet</u>, Act II, Scene ii, 43.

on the judge's assessment that the probationer is a good risk for such more lenient treatment. If, however, the judge is subsequently persuaded, generally by the subject's conduct, pre-release or post-release, that the subject is actually a bad risk in terms of future behavior, the judge may revoke the probation.

If the probationer is already serving on probation, the probation will be terminated. If the probationary period has not yet begun, the award of probation will be revoked in advance of its beginning. The judge's assessment of risk is precisely the same whether made pre-release or post-release. Judge McAuliffe well stated the rationale of the revocation process in Matthews, 304 Md. at 293:

> The commission of a new crime during the interval between the imposition of sentence and the effective date of probation may furnish proof that a defendant cannot conduct himself in conformity with societal standards and he may rightfully forfeit his freedom as a result.

(Emphasis supplied).

The mere labels of "pre-release" or "post-release" should not be permitted to obscure the undergirding unity of what is decided. We must not get tripped up by the labeling.

## An Alternative Conceptualization

The apparent paradox of one's violating probation at a time when one is not yet on probation has a certain simplistic allure. The paradox fades, however, on closer examination. We can easily avoid the riddle with an alternative conceptualization of the legal status we are dealing with.

14

"Probation" is a broad enough concept to embrace within it more than one connotation. When a sentencing judge pronounces an award of probation, probation in its larger sense has begun, regardless of whether probation connotes the immediate status of the defendant (probation in esse) or is simply the promise or expectation of a future probation (probation in potentia) once the active part of the prison sentence has been served. If the judge subsequently learns that the probation is actually not a good risk, it is of no consequence whether that revelation comes while the probation is still in potentia or whether it is already in esse. In either event, it will be revoked. To say, therefore, carefully and precisely, that probation in its larger sense may be revoked even before it has become probation in esse is no paradox at all. We must, however, beware of shifting connotations.

### Notice Of February 21, 2017, Hearing

The hearing at which Judge Greenberg listened to the five recorded telephone calls the appellant had made from jail to Ms. Hakemian and at which Judge Greenberg revoked the appellant's probation took place on February 21, 2017. The appellant's second contention is that he was denied due process because his counsel was not given adequate notice of that February 21, 2017, hearing to decide whether this probation should be revoked.

This contention is based entirely on the appellant's misreading of the trial record, including the docket entries, and was not pursued by the appellant at oral argument. It was based on appellant's mistaken belief that the State's Petition for Violation of Probation was not filed until February 3, 2017, a mere three weeks before the revocation hearing. That mistaken reading is reflected in Footnote 8 and Footnote 9, both on page 19, of the

15

appellant's appellate brief. The Petition for Violation of Probation, however, was actually filed one year earlier, on February 3, 2016. The appellant was represented by Theresa Chernosky of the Public Defender's Office as of December 22, 2016, a full 14 months before the hearing in question. The State's petition was, to be sure, styled as a "State's Notice for Appropriate Relief," but there was no mistaking its contents, its purpose, and its allegations.

Under the circumstances, it is pointless to recite the numerous motions to continue the hearing, including Consent Motions, Joint Motions, and motions by the appellant alone so that he would have time to listen to all of the recorded telephone calls that the State had provided him in discovery. The contention is palpably without merit.

The appellant's companion contention that "he was denied an impartial arbiter" has not been preserved for appellate review.

### The Legality Of The Sentence

On March 16, 2017, the appellant filed a Motion to Correct an Illegal Sentence pursuant to Maryland Rule of Procedure 4–345(a). On March 29, 2017, Judge Greenberg denied that motion without a hearing. On April 18, 2017, the appellant appealed from that denial. It is that appeal which is now before us as the appellant's third contention. Maryland Rule 4–345(a) provides:

(a) Illegal Sentence. The court may correct an illegal sentence at any time.

In Carlini v. State, 215 Md. App. 415, 419–20, 81 A.3d 560 (2013), this Court focused in on the critical distinction between a procedurally flawed trial process (in a sense an "illegality") leading to a sentence and an inherently illegal sentence itself.

16

What is an illegal sentence? That all depends upon what one means by "an illegal sentence." There are countless illegal sentences in the simple sense. They are sentences that may readily be reversed, vacated, corrected or modified on direct appeal, or even on limited post-conviction review, for a wide variety of procedural glitches and missteps in the sentencing process. Challenges to such venial illegalities, however, are vulnerable to such common pleading infirmities as non-preservation and limitations. There is a point, after all, beyond which we decline to revisit modest infractions. There are, by contrast, illegal sentences in the pluperfect sense. Such illegal sentences are subject to open-ended collateral review. Although both phenomena may casually be referred to as illegal sentences, there is a critically dispositive difference between a procedurally illegal sentencing process and an inherently illegal sentence itself. **It is only the latter that is grist for the mill of Maryland Rule 4–345(a)**[.]

(Emphasis supplied; footnote omitted).

In Matthews v. State, 197 Md. App. 365, 367, 13 A.3d 834 (2011), rev'd on other grounds, 424 Md. 503, 36 A.3d 499 (2012), we also spoke of "the enigma that an illegal sentence is not always an illegal sentence." The Court of Appeals has consistently and austerely limited Rule 4–345(a) review to those cases where the illegality lies not in a flaw in the procedural process antecedent to the sentence but to those limited instances where the illegality is inherent in the sentence itself. In Chaney v. State, 397 Md. 460, 466, 918 A.2d 506 (2007), Judge Wilner emphatically stated:

The scope of this privilege, allowing collateral and belated attacks on the sentence and excluding waiver as a bar to relief, is narrow, however. We have consistently defined this category of "illegal sentence" as limited to those situations in which the illegality inheres in the sentence itself; i.e., there either has been no conviction warranting any sentence for the particular offense or the sentence is not a permitted one for the conviction upon which it was imposed and, for either reason, is intrinsically and substantively unlawful.

(Emphasis supplied; citations omitted).

In <u>Johnson v. State</u>, 427 Md. 356, 367, 47 A.3d 1002 (2012), the Court of Appeals

spoke equally forcefully about Rule 4–345(a)'s narrow window of availability.

> To constitute an illegal sentence under Rule 4–345(a), "<u>the illegality must</u>
> <u>inhere in the sentence itself, rather than stem from trial court error during the</u>
> <u>sentencing proceeding</u>." Accordingly, "we have denied relief pursuant
> to Rule 4–345(a) because the sentences imposed were <u>not inherently illegal,</u>
> <u>despite some form of error or alleged injustice</u>."

(Emphasis supplied; citations omitted).

In <u>Tshiwala v. State</u>, 424 Md. 612, 619, 37 A.3d 308 (2012), the Court was equally

firm:

> [W]here the sentence imposed is not inherently illegal, and where the matter
> complained of is a procedural error, the complaint does not concern an illegal
> sentence for purposes of Rule 4–345(a). A sentence does not become "an
> illegal sentence because of some arguable procedural flaw in the sentencing
> procedure."
>
> These principles, delineating the narrow scope of a Rule 4–
> 345(a) motion to correct an illegal sentence, have been recognized and
> applied in a multitude of this Court's opinions. ". . . . <u>We have consistently</u>
> <u>defined this category of 'illegal sentence' as limited to those situations in</u>
> <u>which the illegality inheres in the sentence itself[.]</u>"

(Emphasis supplied; citations omitted).

## A. Did The Sentence Honor The Plea Agreement?

The appellant specified that the court ultimately imposed an illegal sentence on him

in two regards. The first is a claim that the sentence excluded the terms of the binding plea

agreement. When Judge Greenberg on February 21, 2017, revoked the appellant's

probation, that revocation reinstated the terms of the sentences as originally pronounced

on November 18, 2011. Because of the revocation of probation, the original sentences were

to be served in full, with no portion of them being suspended. When Judge Greenberg

18

pronounced the appellant's sentence originally on November 18, 2011, he did so in the following terms:

> THE COURT: So, this is my sentence in this case. On Count 1, first degree assault, <u>I'm going to sentence you to 25 years</u> in the Division of Correction. I'm going to suspend all but 10 years, which will commence on May 17th, 2011. I'm assuming you've been incarcerated since this happened?
>
> . . . .
>
> On Count 3, <u>I'm going to sentence you to 20 years</u> in the Maryland Division of Corrections. Suspend all but five years, commencing on May 17th, 2011. <u>That sentence will run concurrently to Count 1.</u>
>
> After your release, you will be on three years of supervised probation.

(Emphasis supplied).

It was everyone's understanding that the sentences then imposed accurately reflected the plea bargain. It is our holding, moreover, that those sentences did indeed accurately reflect the plea bargain.[3] There was no murmur of objection or protest by anyone.[4] It was a logical and symmetrical sentence that made eminently good sense.

---

[3] The chance that the trial judge on November 18, 2011, may, in mentioning the plea bargain before passing sentence, have inadvertently misspoken by dropping a couple of words is no substitute for affirmative evidence from anyone, including the appellant himself, that the plea bargaining had actually produced what would have been a weird, then apparently insignificant, and exceedingly improbable provision. We are not going to treat every hurried word (or lack thereof) as if it had been chiseled in marble. We are not going to sanctify an absurdity.

[4] Quite aside from our holding in this regard, it is also clear that the appellant is technically challenging the sentence of February 21, 2017, and not the original sentence of November 18, 2011. It is not for us to connect the dots for him.

When on February 21, 2017, following the revocation of the appellant's probation, Judge Greenberg formally re-announced the full and unsuspended sentences, he did so in terms essentially verbatim with his original sentencing of November 18, 2011, absent the suspension and imposition of probation:

> THE COURT: So, I'm going to impose the following sentence. I'm going to <u>on Count 1, sentence you to 25 years</u> at the Department of Corrections, commencing on May 17, 2011. And <u>as to Count 3, 20 years</u>, commencing on the same date, which is <u>concurrent to Count 1</u>.

(Emphasis supplied).

We hold that the appellant was not subjected to any illegal sentence pursuant to Rule 4–345(a).

## B. Back To The Future

As his second subcontention under his third contention, the appellant harkens back to an earlier contention. He now claims that his sentence, to wit, the revocation of probation (assuming, <u>arguendo</u>, without deciding whether that would qualify as a sentence for Rule 4–345(a) purposes), would be inherently illegal if it were based upon an ostensible violation that would have been impossible to commit in real time, to wit, his earlier complaint about a violation of probation before probation had commenced. His argument is based clearly on the apparent time paradox.

> This statute permits <u>a charge of violation of probation to be brought only if the violation occurred "during the period of probation."</u> Thus, <u>the lower court had no authority to revoke Mr. McKinney's probation because no violation occurred during the period of probation.</u> Even assuming, <u>arguendo</u>, that a court has the authority to revoke probation before it commences, . . . <u>the court could not revoke probation before it commenced as this constituted a breach of the plea agreement.</u>

(Emphasis supplied).

That argument seems to be that the sentence (the revocation of probation) would be illegal because the State's evidence was not sufficient (the violation did not occur at the right time) to support the conviction. Even assuming, <u>arguendo</u>, every word of that proposition to be true, it would classically, under well-established Rule 4–345(a) principles, be a mere procedural illegality that would not be an inherent illegality in the sentence itself. It would not, therefore, support the appellant's third contention. That, however, would be redundant since we have already dismantled the predicate for the argument in disposing of the appellant's first contention. <u>Matthews v. State</u> disposes of the appellant's third contention as surely as it disposed of his first contention.

## C. Probation Implies The Possibility Of Its Revocation

In positing the inherent illegality of his "sentence," the appellant, as a third subcontention, alleges that the revocation of probation "constituted a breach of the plea agreement." Because the plea agreement had never explicitly mentioned the possibility of probation's being revoked or of the original sentences, before suspension, being re-imposed, the appellant alleges that these actions constituted an illegal increase in the agreed-upon sentences and thereby breached the plea agreement.

> [N]othing in Mr. McKinney's contract with the court and state specified that an offense committed while incarcerated would impact his ultimate sentence which, as part of the plea agreement, was capped at ten years. As such, the plea agreement was binding and by increasing Mr. McKinney's sentence, the lower court breached the plea agreement and Mr. McKinney is entitled to specific performance.

(Emphasis supplied).

In pointing out the necessarily implicit, as well as expressly explicit, terms of any plea bargain, Judge (now Chief Judge) Woodward in <u>Rankin v. State</u>, 174 Md. App. 404, 410, 921 A.2d 863, <u>cert. denied</u>, 400 Md. 649, 929 A.2d 891 (2007), spoke for the Court:

> [I]t is clear that <u>a probationary period was implicit in the terms of the plea agreement</u>. Although <u>the prosecutor did not specifically discuss probation</u>, he told the trial court that the only sentencing limitation in the agreement was that the "active cap," <u>i.e.</u>, the executed portion of the sentence, was three years. <u>The written agreement recited that there could be additional suspended time</u> and that there was "no other sentencing limitation except that provided by law." Thus <u>the agreement gave the trial court the authority to suspend part of the sentence and impose probation, which it did.</u>

(Emphasis supplied).

In <u>Coles v. State</u>, 290 Md. 296, 305, 429 A.2d 1029 (1981), a plea agreement had never mentioned the subject of restitution. When an order of restitution was imposed as a condition of probation, the defendant complained that his sentence was being illegally increased in what amounted to a breach of the plea agreement. The Court of Appeals held that the failure of a plea agreement to mention restitution by no means implies that there is an agreed-upon sentencing cap that precludes restitution. <u>See also Lafontant v. State</u>, 197 Md. App. 217, 13 A.3d 56, <u>cert. denied</u>, 419 Md. 647, 20 A.3d 116 (2011).

In <u>Carlini v. State</u>, 215 Md. App. at 450, this Court emphatically stated that the standard conditions of probation are present and binding even though they have not been expressly spelled out in a plea agreement.

> <u>A plea agreement</u> that necessarily includes the possibility or probability of probation <u>need not expressly spell out each and every standard condition of probation. The plea agreement need not spell out that the defendant could be in violation of probation if, for instance, he</u> failed to report regularly to his probation officer or failed to get permission before

changing his home address or <u>used narcotic drugs</u> or refused to allow his probation officer to visit his home.

. . . .

<u>There is no prioritizing</u>, as a matter of law, <u>among the conditions of probation, the breach of any one of which could lead to a violation of probation</u>.

(Emphasis supplied).

The question here posed essentially answers itself. Notwithstanding whatever a plea agreement may or may not have said, and notwithstanding whatever the defendant may have thought it meant, an inmate is self-evidently no longer contractually entitled to imminent probation the day after he has shot and killed the warden. Superseding events may always make a difference.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**